*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GABRIELLE BEEBE and DEANNA DITTENBER,

Plaintiffs-Appellants,

v

AG MANAGEMENT COMPANY, LLC, and PSM
INVESTMENT PROPERTIES, LLC,

Defendants-Appellees,

and

PAULETTE MICHEL LOFTIN and LAW OFFICES
OF PAULETTE LOFTIN, LLC,

Defendants.

UNPUBLISHED
January 5, 2023

No. 356145
Oakland Circuit Court
LC No. 2020-181884-CH

Before: M. J. KELLY, P.J., and MURRAY and RIORDAN, JJ.

PER CURIAM.

Plaintiffs, Gabrielle Beebe and Deanna Dittenber, appeal the trial court's opinion and order granting summary disposition in favor of defendants AG Management Company, LLC ("AG Management") and PSM Investment Properties, LLC ("PSM"), pursuant to MCR 2.116(C)(8) and (C)(10), in this action involving a dispute over a residential security deposit.[1] For the reasons set

---

[1] This Court initially denied plaintiffs' application for leave to appeal, *Beebe v AG Mgt Co, LLC*, unpublished order of the Court of Appeals, entered April 22, 2021 (Docket No. 356145), but our Supreme Court subsequently remanded the case to this Court for consideration as on leave granted. *Beebe v AG Mgt Co, LLC*, 508 Mich 966 (2021). Defendants Paulette Michel Loftin and Law Offices of Paulette Loftin, LLC, were dismissed from this action and are not parties to this appeal. Accordingly, references to "defendants" in this opinion shall refer only to defendants AG Management and PSM.

forth in this opinion, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises from a lease of residential property in Oak Park, Michigan. The property is owned by PSM and managed by AG Management. Plaintiffs were both listed as tenants and both were parties to the lease agreement. AG Management Company collected a security deposit of $1,792 from plaintiffs. On February 20, 2019, plaintiffs gave notice that they intended "to terminate their occupancy and their month to month tenancy." Although Beebe vacated the property and turned in her keys on April 5, 2019, plaintiff Dittenber continued to have possessions at the property and did not turn in her keys until April 11, 2019. On May 6, 2019, AG Management prepared a statement of security deposit resolution (SDR), in which it claimed $790.17 against plaintiffs' security deposit. After plaintiffs disputed the SDR, AG Management agreed to refund an additional $70.70 of the security deposit. In an e-mail dated May 21, 2019, Beebe expressed her continued dissatisfaction with the assessed charges.

On June 19, 2020, plaintiffs filed this action contesting defendants' right to retain the security deposit. Count I of plaintiffs' first amended complaint alleged violations of the Landlord Tenant Relationships Act (LTRA), MCL 554.601 *et seq.* In Count II, plaintiffs asserted a claim for statutory conversion, MCL 600.2919a(1)(a), based on defendants' retention of the security deposit balance. Count III alleged violations of the Truth in Renting Act (TIRA), MCL 554.631 *et seq.* Count IV alleged fraud by both defendants. Finally, Count V alleged a claim against both defendants for unlawful civil conspiracy. Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10) on all claims. Following a hearing, the trial court granted defendants' motion and dismissed plaintiffs' claims in their entirety.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). Defendants moved for summary disposition under both MCR 2.116(C)(8) and (C)(10). In *El-Khalil*, our Supreme Court explained:

> A motion under MCR 2.116(C)(8) tests the *legal sufficiency* of a claim based on the factual allegations in the complaint. *Feyz v Mercy Mem Hosp*, 475 Mich 663, 672; 719 NW2d 1 (2006). When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone. *Bailey v Schaaf*, 494 Mich 595, 603; 835 NW2d 413 (2013); MCR 2.116(G)(5). A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery. *Adair v Michigan*, 470 Mich 105, 119; 680 NW2d 386 (2004).
>
> A motion under MCR 2.116(C)(10), on the other hand, tests the *factual sufficiency* of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the

motion. *Id*. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted). [*El-Khalil*, 504 Mich at 159-160.]

This case also requires construction of different statutes. In *Wayne Co v AFSCME Local 3317*, 325 Mich App 614, 633-634; 928 NW2d 709 (2018), this Court explained:

> The primary task in construing a statute is to discern and give effect to the Legislature's intent, and in doing so, we start with an examination of the language of the statute, which constitutes the most reliable evidence of legislative intent. *City of Coldwater v Consumers Energy Co*, 500 Mich 158, 167, 895 NW2d 154 (2017). When the language of a statutory provision is unambiguous, we must conclude that the Legislature intended the meaning that was clearly expressed, requiring enforcement of the statute as written, without any additional judicial construction. *Id*. Only when an ambiguity in a statute exists may a court go beyond the statute's words to ascertain legislative intent. *Id*. We must give effect to every word, phrase, and clause in a statute, avoiding a construction that would render any part of the statute nugatory or surplusage. *Id*. at 167-168.

### III. PLAINTIFFS' CLAIMS UNDER THE LTRA AND CONVERSION

Plaintiffs challenge the trial court's dismissal of their claims for violation of the LTRA. They argue that the trial court erred in its interpretation of the statutory phrase "termination of occupancy" and by concluding that they did not vacate the leased premises until April 11, 2019. According to plaintiffs, they vacated the lease premises on April 5, 2019, and therefore, defendants' May 6, 2019 SDR was untimely. As such, plaintiffs argue, defendants waived any claim to the security deposit. Plaintiffs also argue that the trial court erred when it determined that defendants' retention of the security deposit balance was not unlawful because it was retained pursuant to the parties' written agreement for purposes of the LTRA, and also by dismissing their claim for conversion on that basis. We agree that defendants did not waive any claim to the security deposit, but hold that the trial court erred by determining that plaintiffs agreed in writing to the final disposition of the security deposit, and also by dismissing plaintiffs' conversion claim on that basis.

This case implicates several provisions of the LTRA that address the disposition of a tenant's security deposit. In *Tree City Props, LLC v Perkey*, 327 Mich App 244, 248; 933 NW2d 704 (2019), this Court explained the purpose of the LTRA:

> The landlord tenant relations act (LTRA), MCL 554.601 *et seq*., "regulate[s] relationships between landlords and tenants relative to rental agreements and the payment, repayment, and use of security deposits." *De Bruyn Produce Co v Romero*, 202 Mich App 92, 108; 508 NW2d 150 (1993). "The act is intended to protect tenants, especially from the situation where a landlord

surreptitiously usurps substantial sums held to secure the performance of conditions under the lease." *Id.* (quotation marks, citation, and alteration omitted).

MCL 554.605 provides:

> For the purposes of this act and any litigation arising thereunder, the security deposit is considered the lawful property of the tenant until the landlord establishes a right to the deposit or portions thereof as long as the bond provision is fulfilled, the landlord may use this fund for any purposes he desires.

MCL 554.602 provides that "[a] landlord may require a security deposit for each rental unit. A security deposit shall be required and maintained in accordance with the terms of this act and shall not exceed 1½ months' rent." However, the landlord "must satisfy certain requirements in order to retain a security deposit." *Tree City Props*, 327 Mich App at 248 (citation omitted).

MCL 554.609 provides, in pertinent part:

> In case of damage to the rental unit or other obligation against the security deposit, the landlord[2] shall mail to the tenant, *within 30 days after the termination of occupancy*, an itemized list of damages claimed for which the security deposit may be used as provided in [MCL 554.607], including the estimated cost of repair of each property damaged item and the amounts and bases on which he intends to assess the tenant. . . . [Emphasis added.]

Further, MCL 554.610 provides that

> [f]ailure by the landlord to comply with the notice of damages requirement within the 30 days *after the termination of occupancy*, constitutes agreement by the landlord that no damages are due and *he shall remit to the tenant immediately the full security deposit*. [Emphasis added.]

MCL 554.612 specifies the requirements a tenant must follow after receiving a landlord's notice of damages, stating, in pertinent part:

> If a landlord claims damages to a rental unit and gives notice of damages as required, the tenant upon receipt of the list of damages shall respond by ordinary mail to the address provided by the landlord as required by [MCL 554.603] within 7 days, indicating in detail his agreement or disagreement to the damage charges listed. . . .

Under MCL 554.613, a landlord is not entitled to retain a security deposit without obtaining a money judgment, subject to certain exceptions, which include a tenant's failure to respond to a

---

[2] PSM, as owner of the subject property, is considered a "landlord" under MCL 554.601(c) of the LTRA.

notice of damages in accordance with MCL 554.612, or where the parties have agreed in writing to the disposition of the balance of the security deposit. Specifically, MCL 554.613(1) provides:

> Within 45 days after termination of the occupancy and not thereafter the landlord may commence an action in a court of competent jurisdiction for a money judgment for damages which he has claimed or in lieu thereof return the balance of the security deposit held by him to the tenant or any amount mutually agreed upon in writing by the parties. A landlord shall not be entitled to retain any portion of a security deposit for damages claimed unless he has first obtained a money judgment for the disputed amount or filed with the court satisfactory proof of an inability to obtain service on the tenant or unless:

> (a) The tenant has failed to provide a forwarding address as required by [MCL 554.611].

> (b) The tenant has failed to respond to the notice of damages as required by [MCL 664.612].

> (c) The parties have agreed in writing to the disposition of the balance of the deposit claimed by the landlord.

As plaintiffs observe, MCL 554.609, MCL 554.610, and MCL 554.613 all provide that the specified time periods are triggered by the termination of "occupancy." Plaintiffs ask this Court to provide a judicial interpretation of this term.

We agree that the trial court did not err by holding that there was no genuine issue of material fact that defendants complied with the 30-day notice requirement in MCL 554.610 because plaintiffs' termination of occupancy did not occur until April 11, 2019, and defendants provided plaintiffs with a notice of damages on May 6, 2019, which was within the requisite 30-day period. Therefore, contrary to plaintiffs' argument, defendants did not waive any claim to the security deposit.

The parties' lease ran from November 10, 2017 until February 28, 2019. The lease provides that after the termination date, the lease is "construed as a month-to-month tenancy" and "[d]uring a month-to-month tenancy, [t]enant shall be subject to all provisions of this Lease." With regard to termination, the lease agreement provides:

> Tenant may not terminate Lease, even with advance notice, prior to End Date, without prior written consent of Landlord. TENANT must furnish written notice to Landlord not less than FORTY-FIVE (45) days in advance of terminating lease.

The lease further provides, as an example, that if the lease relationship were to end on April 30, then written notice must be received by March 15. Section 10 of the lease provides that on "termination" of the lease, the tenant is to return all keys to the landlord, but that "[a]cceptance of [the] return of keys by Landlord shall not constitute a release from any other requirement in this Lease, other than the requirement of Tenant to return the keys."

-5-

The record reflects that Beebe provided notice to AG Management on February 20, 2019, that plaintiffs would be vacating the premises, and that on April 5, 2019, Beebe provided her keys to a representative of AG Management. However, Dittenber did not turn in her keys until April 11, 2019, and her personal possessions remained in the home until that date. MCL 554.610 specifies that AG Management was required to comply with the notice of damages requirement within 30 days after the "termination of occupancy." Because the LTRA does not define "occupancy," and undefined terms are construed in accordance with their plain and ordinary meaning, it is appropriate to consult dictionary definitions to determine the "common and ordinary meaning" of the term "occupancy." *Krohn v Home-Owners Ins Co*, 490 Mich 145, 156; 802 NW2d 281 (2011). The *Merriam Webster's Collegiate Dictionary* (11th ed.) defines "occupancy," in relevant part, as "the fact or condition of holding, possessing, or residing in or on something." The undisputed evidence established that Dittenber continued to have personal possessions in the home and did not surrender her keys to the home until April 11, 2019. Although Dittenber, who was a named party to the lease, may not have continued to physically reside at the home until that date, because she still had personal possessions there and still had a key to the home, she effectively continued to hold or possess the premises until that date. Indeed, a representative of AG Company informed Dittenber that rent would continue to be prorated until she removed her belongings and turned in her keys. Section 10 of the lease agreement also provided that "[o]n termination of this Lease, Tenant will return all keys to the Premises to Landlord." This further supports our conclusion that Dittenber's retention of her keys, in addition to still having possessions at the home, until April 11, 2019, was consistent with holding and possessing the premises until that date. Moreover, the practical impact of Dittenber leaving personal items at the premises, and not returning her keys, is that AG Management was not in a position to lease the premises to another party. Accordingly, the trial court did not err by holding that defendants complied with MCL 554.610 when it provided the SDR to plaintiffs on May 6, 2019, which was within 30 days of the termination of occupancy on April 11, 2019. Thus, defendants did not waive any claim to the security deposit under MCL 554.610.

However, where a tenant has timely responded to the landlord's notice of damages and disputes the amount, MCL 554.613(1) limits a landlord's right to retain a security deposit without commencing an action for a money judgment of damages, subject to certain exceptions. One such exception is that "[t]he parties have agreed in writing to the disposition of the balance of the deposit claimed by the landlord." MCL 554.613(1)(c). Although the trial court ruled that defendants were entitled to summary disposition because the evidence established that plaintiffs had agreed in writing to the disposition of the balance of the security deposit, the court did not explain the factual basis for this conclusion. It merely stated: "[T]he Court finds that Plaintiffs claims under the Landlord Tenant Relationship Act ("LTRA") fail because Plaintiffs agreed in writing to the final disposition of the security deposit. See MCL 554.613(1)(c)."

In support of their argument that the parties agreed in writing to a final disposition of the security deposit, defendants rely on May 20 and 21, 2019, e-mails exchanged between Beebe and a representative of AG Management.[3] In those e-mails, AG Management identified the various

---

[3] Although plaintiffs refer to e-mail exchanges between them and a representative of AG Management on April 5, 2019, those e-mail documents were not presented to the trial court.

charges that were being claimed against the security deposit. After Beebe protested, AG Management agreed to refund an additional $70.70. Beebe then further disputed a charge of $182.82 for spring cleanup. The AG Management representative explained that the charge was related to yard cleanup that should have been done the preceding fall and stated that the charge would have been better characterized as "fall clean-up." Beebe responded in the following manner:

> Yikes. Disappointing to say the least the behavior of said "owners" during our experience with AG. We were responsible for the cleanup last spring, paying our own money, WELL over $180 to clean that yard. Me and Deanna have agreed multiple times that neither of us have experienced such an embarrassing amount of greed from a rental company and will be sure to use our platforms to let our network know to be cautious and avoid AG. I myself have been renting for 10 years and have never dealt with so many eye-roll situations. Please if you can at least make speedy [sic] with the return of the deposit so me and Deanna can resolve the final piece of this lack-luster experience.

We disagree with AG Management's assertion that the e-mail exchange between Beebe and AG Management reflects a negotiation of "the terms of resolving the security deposit dispute." If anything, the e-mails reflect a contentious and unresolved dispute between AG Management and Beebe regarding the outstanding amount of the security deposit, and rather than showing an acquiescence by Beebe, her final words reflect resignation and a desire to simply end the conversation, having clearly understood that AG Management was not willing to refund the charge for the spring/fall cleanup. It is difficult to characterize Beebe's final response as reflecting her agreement to the disposition of the security deposit as explained by AG Management. Moreover, the record indicates that Beebe did not cash any checks that were issued to her. There is at least a genuine issue of material fact regarding whether plaintiffs in fact agreed in writing to the disposition of the balance of the deposit claimed by AG Management. Therefore, the trial court erred by granting summary disposition in favor of defendants with respect to this issue.

We also agree that reversal of the trial court's dismissal of plaintiffs' conversion claim is proper. In *Magley v M & W, Inc*, 325 Mich App 307, 314; 926 NW2d 1 (2018), this Court explained that under the common law and MCL 600.2919a, conversion is "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."[4] (Citation and quotation marks omitted.) The tort of conversion requires

---

Accordingly, they may not be considered on appeal. *Sherman v Sea Ray Boats, Inc*, 251 Mich App 41, 56; 649 NW2d 783 (2002) ("This Court's review is limited to the record established by the trial court, and a party may not expand the record on appeal.").

[4] In *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 353; 871 NW2d 136 (2015), our Supreme Court explained the evolution of the common-law tort of conversion that led to the enactment of MCL 600.2919a, stating:

*Footnote 4, continued*: While the tort of conversion originally required a separate showing that the converter made some use of the property that amounted to a total deprivation of that property

intentional conduct, in that the party who commits the conversion must act in a willful manner, and a party's good faith, mistake, or ignorance will not provide a valid defense to the claim of conversion. *Magley*, 325 Mich App at 314-315. MCL 600.2919a further provides, in pertinent part:

> (1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:
>
> (a) Another person's stealing or embezzling property or converting property to the other person's own use.

The trial court rejected plaintiffs' claim that defendants converted their security deposit on the basis of its conclusion that defendants did not wrongfully retain plaintiffs' security deposit "because [plaintiffs] agreed to the final disposition of the security deposit." However, in light of our conclusion that there are genuine issues of material fact whether plaintiffs in fact "agreed in writing to the disposition of the balance of the deposit claimed by the landlord," MCL 554.613(1)(c), it follows that a question of fact also exists with respect to whether defendants willfully exercised dominion over plaintiffs' security deposit in a manner that was inconsistent with plaintiffs' rights. Accordingly, we also reverse the trial court's grant of summary disposition in favor of defendants with respect to plaintiffs' conversion claim.

## IV. PLAINTIFFS' CLAIMS UNDER TIRA

In Count III of their complaint, plaintiffs alleged that their lease agreement with defendants contained several provisions that violated the TIRA. The trial court held that plaintiffs lacked standing to raise these alleged violations because plaintiffs were no longer tenants when they filed this action. We agree.

MCL 554.636 provides a "tenant" with several avenues of redress if a rental agreement includes provisions that violate MCL 554.633. In particular, MCL 554.636(1) provides:

> If a rental agreement contains a provision which violates [MCL 554.633], and if the landlord fails to cure the violation by exercising the notice provisions of [MCL 554.635] within 20 days after the tenant gives written notice to the landlord of the provision believed to be in violation and the reason therefor, a tenant may bring an action for any of the following relief:
>
> (a) To void the rental agreement and terminate the tenancy.
>
> (b) To enjoin the lessor from including the provision in any rental agreement subsequently entered into and to require the lessor to exercise the notice procedure

_____

to its owner, by the twentieth century common-law conversion more broadly encompassed any conduct inconsistent with the owner's property rights. In this context, the Legislature enacted MCL 600.2919a[.]

provided in [MCL 554.635] to cure the violation in all rental agreements in which the provision occurs and to which the lessor is currently a party.

(c) To recover damages in the amount of $250.00 per action, or actual damages, whichever is greater.

Similarly, MCL 554.636(2) prescribes remedies a tenant may pursue if a rental agreement does not include a provision required by MCL 554.634, or contains a provision prohibited by MCL 554.633. However, as the trial court observed, MCL 554.636(7) provides that "[f]or purposes of this section, 'tenant' means a person who is currently a party to a rental agreement with the lessor."

In the matter before us, it is undisputed that plaintiffs terminated the lease agreement in April 2019, and that they were no longer parties to a lease agreement with defendants when they filed this action in June 2020. *Merriam Webster's Collegiate Dictionary* (11th ed.) defines "current," in relevant part, as "occurring in or existing at the present time." Accordingly, while the parties are now litigating the disposition of plaintiffs' security deposit, plaintiffs were not persons who were "*currently* a party to a rental agreement" with AG Management when they filed this action, given that their lease agreement terminated in April 2019. Therefore, we agree with the trial court that plaintiffs could not pursue claims under the TIRA because they did not satisfy the statutory definition of "tenant" under MCL 554.636(7). Consequently, we affirm the trial court's dismissal of plaintiffs' TIRA claims.

## V. PLAINTIFFS' CLAIMS FOR CIVIL CONSPIRACY AND FRAUD

Plaintiffs argue that the trial court erred by dismissing their claims for civil conspiracy and fraud. We hold that the trial court did not err by dismissing plaintiffs' fraud claims, and that plaintiffs have abandoned any claim of error related to the dismissal of their claim for civil conspiracy.

In *Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012), our Supreme Court identified the following elements of actionable fraud:

The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. [Quoting *Candler v Heigho*, 208 Mich 115, 121, 175 NW 141 (1919), overruled in part on other grounds by *United States Fidelity & Guaranty Co v Black*, 412 Mich 99, 116 n 8; 313 NW2d 77 (1981) (citation and quotation marks omitted).]

With regard to the doctrine of silent fraud, our Supreme Court explained that if a legal or equitable duty of disclosure exists, " '[a] fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated

to sustain recoveries where the truth has been suppressed with the intent to defraud.' " *Titan*, 491 Mich at 557, quoting *Tompkins v Hollister*, 60 Mich 470, 483; 27 NW 651 (1886).

In support of their claims that AG Management engaged in fraud, plaintiffs point to § 33(B) of the lease agreement, which provides, in pertinent part:

> *In accordance with State Law*, Landlord will complete a Security Deposit Resolution (SDR), including a detailed list of damages and amounts charged against Tenant's Security Deposit for these damages, within 30 days of move-out, if a forwarding address has been provided. In cases where the Security Deposit is in excess of the amounts charged for rent, damages, and other charges, Landlord will refund the excess deposit to Tenant. Cashing of the check will be deemed full satisfaction of all claims specifically referenced in the Security Deposit Resolution pursuant to Section 3-311 of the Uniform Commercial Code [UCC]. . . . [Emphasis added.]

Plaintiffs argue that this language misrepresents that the UCC, rather than the LTRA, controls disputes over security deposits. We disagree. This paragraph references the UCC only in the context of referring to the effect of cashing a check offered in satisfaction of a disputed claim. Further, § 33(B) otherwise clearly outlines how AG Management is required to complete a SDR in compliance with state law, which would include the LTRA.

Additionally, to the extent that plaintiffs refer to checks from AG Management that they did not cash, while the memorandum line states on check ****57 "Security Deposit Refund," and states on checks ****61 and ****62 "SDR Dispute, Resolution in Full," there is nothing on the face of these documents, or otherwise in the record, to suggest that these statements were false, or that agents of AG Management made the statements knowing they were false, with the intention that plaintiffs would rely on them to their detriment. *Titan*, 491 Mich at 555. Indeed, because plaintiffs did not cash the checks, they could not have relied on them.

Finally, plaintiffs point to an April 8, 2019 text message exchange between an AG Management representative and Dittenber, in which the representative told Dittenber that she could not mark plaintiffs as moved out of the premises until Dittenber turned in her keys, and that rent would continue to be prorated until Dittenber's keys were turned in. Plaintiffs contend that these statements were not consistent with § 10 of the lease agreement, but the lease agreement expressly states that "[o]n termination of this Lease, Tenant will return all keys to the Premises to Landlord." Accordingly, the representative's statements to Dittenber that termination would not be effective until the keys were turned in were indeed consistent with the terms of the lease agreement.

For the foregoing reasons, the trial court did not err by dismissing plaintiffs' fraud claims.[5]

---

[5] Plaintiffs have not provided a meaningful and cogent legal argument in support of their claim that the trial court erred by dismissing their claim for civil conspiracy, including by failing to cite any legal authority or facts of record. Accordingly, they have abandoned this claim on appeal. *In Re Conservatorship of Murray*, 336 Mich App 234, 260; 970 NW2d 372 (2021).

## VI.  CONCLUSION

Affirmed in part, reversed in part, and remanded to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Michael J. Riordan